UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IRONBEAM, INC., a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) Case No. 1:18-cv-00992 |
| v. | ) ) Hon. Steven C. Seeger |
| GREGORY PAPADOPOULOS, an individual, and GPPB, LLC, a limited liability company, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

On February 5, 2018, the stock market suffered a historic fall. The Dow dropped nearly 1,600 points, and the S&P 500 fell more than four percent. One of the traders caught up in the freefall was Defendant Gregory Papadopoulos, who traded commodity futures through his company, Defendant GPPB, LLC. GPPB's trading account lost nearly $500,000 in a single day. Worse yet, the account suffered a negative balance – the value of GPPB's positions fell from $89,476 to negative $409,208.

The broker for the account, Plaintiff Ironbeam, Inc., liquidated GPPB's positions to salvage any remaining value, and later filed suit against GPPB and Papadopoulos to collect on the unpaid balance. GPPB did not respond to the Complaint, so this Court entered a default judgment against the firm. Ironbeam now moves for summary judgment against Papadopoulos in his capacity as the guarantor of GPPB's account.

Papadopoulos does not dispute the basic facts arrayed against him. He does not dispute that GPPB owes hundreds of thousands of dollars to Ironbeam, or that he guaranteed GPPB's

obligations.  Instead, Papadopoulos spins a tale that his broker conspired with the FBI and an organized crime family to cause the losses.  That story, colorful as it may be, suffers from a complete lack of supporting evidence.

Based on the undisputed facts, Papadopoulos breached his guarantee agreement with Ironbeam by failing to pay for GPPB's losses.  Plaintiff's motion for summary judgment [58] is granted on the claim under the guarantee agreement.

**Background**

Commodity trading involves "highly leveraged and rapidly fluctuating markets" that may lead to "significant losses," including losses that "substantially exceed" a customer's margin deposits with the broker.  *See* Dckt. No. 59, Ex. C, at ¶ 2.  This case is case in point.

On November 15, 2015, Papadopoulos signed a Customer Agreement and a Personal Guarantee Agreement with Ironbeam, a commodity broker registered with the Commodity Futures Trading Commission.  *See* Plaintiff's Statement of Material Facts in Support of Summary Judgment Motion ("Statement of Facts"), at ¶¶ 1, 3–5 (Dckt. No. 59); *see also* Dckt. No. 59, Exs. B, C.  The most basic fact – the identity of the customer – is not clear from the face of the Customer Agreement itself.  The Customer Agreement refers to the "Customer," but for whatever reason, it does not define who the "Customer" is.  *See* Dckt. No. 59, Ex. C.  That is, the agreement itself does not reveal whether Papadopoulos signed on his own behalf, or on behalf of an entity.

The Personal Guarantee Agreement – signed the very same day – fills the gap.  That agreement provides that Ironbeam was "enter[ing] into the Customer Agreement . . . with GPPB LLC."  *Id.* Ex. B.  The signature block also sheds some light.  Papadopoulos signed the Personal Guarantee Agreement as the "GENERAL MANAGER" of the "Account Holder."  *Id.* (all caps

in original). Taken together, the two agreements establish that GPPB was the Customer, and Papadopoulos was the guarantor.[1] That's consistent with the account statement, too, which identifies the customer as "GPPB LLC." *See* Dckt. No. 59, Ex. D, at 1; *see also* Statement of Facts, at ¶ 5 (stating that GPPB "opened a commodity futures trading account with Ironbeam").

Under the Customer Agreement, Ironbeam agreed to serve as GPPB's broker for the trade of commodity futures. A commodity futures contract is an agreement to buy or sell a commodity at a specific price on a specific date. Each side of the contract basically makes a bet about the future price of a commodity. Buyers and sellers place their trades through registered brokers, who in turn execute the trades with a futures clearinghouse. *See ADM Investor Services, Inc. v. Collins*, 515 F.3d 753, 756 (7th Cir. 2008). The clearinghouse serves as the middleman: it is the buyer to each seller, and the seller to each buyer. *Id.*

Commodity futures traders must put money down as a deposit with their brokers. Known as "margin," this deposit represents "only . . . a fraction of the actual cost on a trade." *Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 958 F.2d 186, 188 (7th Cir. 1992). "Margins in the futures markets are not down payments like stock margins, but are performance bonds designed to ensure that traders can meet their financial obligations." *See Economic Purpose of Futures Markets and How They Work*, U.S. Commodity Futures Trading Commission, https://www.cftc.gov/ConsumerProtection/EducationCenter/economicpurpose.html (last visited Jan. 10, 2020). Margin helps protect brokers from holding the bag when the traders

---

[1] In its amended complaint, and in its summary judgment motion, Ironbeam suggests that Papadopoulos might *also* be a customer under the Customer Agreement, and thus might have personal liability under that agreement. *See* Dckt. No. 11, at ¶ 7; Dckt. No. 58 ("Plaintiff moves for summary judgment on its claims for breach of contract and guarantee."). But in its memorandum supporting its summary judgment motion, Ironbeam dropped the argument. "For the purposes of this motion, Plaintiff will leave aside the issue as to whether or not Papadopoulos is also directly liable for the debit since he arguably signed the customer agreement in his individual capacity." *See* Dckt. No. 60, at 1 n.1. So, for now, the only issue before the Court is Papadopoulos's liability as guarantor.

3

suffer losses. *See In re MF Global Inc.*, 531 B.R. 424, 435 (Bankr. S.D.N.Y. 2015) ("Margin is a security deposit to insure that futures commission merchants have adequate customer funds to settle open positions and is required by brokerage houses and exchanges to assure their own financial integrity and the financial integrity of the entire market place.") (quoting *Friedman v. Dean Witter and Company, Inc. et al.*, Comm. Fut. L. Rep. (CCH) ¶ 21,307, 1981 WL 26050, at *1 (Nov. 13, 1981)).

Traders can buy positions worth many times more than the margin they have deposited. But if the value of the positions declines, the broker can demand more margin from the trader to protect itself against the risk of loss. *See ADM Investor Services*, 515 F.3d at 756. Traders must provide enough margin so that "short-term price movement[s]" on the futures contracts won't wipe out their account balances. *Id.* Margin reduces the risk posed by default, particularly given that a "futures contract is executory; no asset changes hands when the contract is formed." *Id.* (citation omitted).

The clearinghouse settles the trades between buyers and sellers, and sets the minimum margin requirements for all futures contracts. *Id.* The brokers, in turn, are responsible to the clearinghouse for the trades. If a trader suffers losses that it cannot pay, the broker must pay the clearinghouse from its own funds. *Id.* ("The futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades."). To protect themselves, brokers enter into contracts with their customers that impose margin requirements and entitle the brokers to liquidate the customers' positions when necessary.

The agreement between Ironbeam and GPPB reflected this industry practice. Ironbeam's Customer Agreement required GPPB to keep enough money in its account to meet "applicable

4

. . . margin requirements," as determined by Ironbeam. Dckt. No. 59, Ex. C, at ¶ 7. "Customer shall, without notice or demand, maintain adequate margin at all times so as to continuously meet the margin requirements established by Ironbeam." *Id.*

The agreement gave Ironbeam substantial remedies if GPPB did not provide enough funds to comply with margin requirements. Ironbeam had the right to close out GPPB's positions – that is, liquidate them – if GPPB did not post enough margin. "If at any time Customer's account does not contain the amount of margin required, Ironbeam may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part, in any manner Ironbeam deems fit, or take any other action it deems necessary to satisfy such margin requirements." *Id.*

The next paragraph of the agreement – entitled "**Liquidation of Accounts**" – gave Ironbeam the power to protect itself by selling GPPB's positions:

> In the event of . . . (i) Ironbeam's determination that any collateral deposited to protect one or more of the Customer's accounts is inadequate, regardless of current market quotations to secure the account; or (j) Ironbeam, for any reason whatsoever, deems itself insecure or if necessary for Ironbeam's protection, then Ironbeam is hereby authorized, in its sole discretion, to sell any or all of the Commodity Interests or other property of Customer which may be in Ironbeam's possession, or which Ironbeam may be carrying for Customer, or to buy in any Commodity Interests or other property of which the account or accounts of Customer may be short, or cancel any outstanding order, in order to close out the account or accounts of Customer in whole or in part or in order to close out any commitment made on behalf of Customer all without any liability on the part of Ironbeam to Customer . . . .

*Id.* at ¶ 8 (bold in original). Note the sweeping language. Ironbeam had "sole discretion" to sell "any or all" of GPPB's positions and "close out the account" if Ironbeam "deem[ed] itself" insecure "for any reason whatsoever." *Id.*

The agreement foreclosed GPPB from second-guessing Ironbeam's liquidation decisions after the fact. "Such sale, purchase or cancellation may be made according to Ironbeam's

5

judgment and may be made at its sole discretion, on the exchange or other market where such business is usually transacted, without notice to Customer or the legal representative of Customer." *Id.* The agreement continued: "Specifically, Ironbeam is hereby authorized, according to its judgment and in its sole discretion, to . . . sell any or all futures contracts, commodities, or securities held or carried for Customer or purchase any or all futures contracts, commodities or securities held or carried as a short position for Customer." *Id.* Ironbeam did not need to give advance notice to GPPB, let alone receive its approval. Ironbeam had the right to make such sales "without prior notice of sale or purchase or other notice or advertisement to Customer." *Id.*

The Customer Agreement repeatedly provided that GPPB was responsible for any shortfall. That is, if the losses in the account were greater than the proceeds from the liquidation, then GPPB had to make up the difference. "Customer shall remain liable for any deficiency." *Id.* "Customer at all times shall be liable for the payment of any debit balance upon demand by Ironbeam, and shall be liable for any deficiency remaining in Customer's account(s) in the event of the liquidation thereof in whole or in part by Ironbeam or by Customer." *Id.* If the proceeds from liquidation were "insufficient for the payment of all liabilities of Customer due to Ironbeam, Customer promptly shall pay, upon demand, the deficit and all unpaid liabilities." *Id.*; *see also id.* at ¶ 5 ("Customer agrees to indemnify Ironbeam and hold Ironbeam harmless from and against any and all deficits, liabilities, losses, damages, cost and expenses . . . including . . . any debit balances which may occur in the Customer's account.").

In the Personal Guarantee Agreement, Papadopoulos agreed to back-stop GPPB's obligations as its guarantor. Papadopoulos "personally guarantee[d] the prompt, full and complete performance of any and all of the duties and obligations of Customer and the payment

6

of any and all damages, costs and expenses which may become recoverable by Ironbeam from Customer." *See* Dckt. No. 59, Ex. B. The Personal Guarantee Agreement reiterated that "[t]his guarantee is unconditional and is a guarantee of payment and performance and not of collection only. Accordingly, each of the undersigned guarantees immediate payment, upon demand, to Ironbeam of all amounts guaranteed hereunder." *Id.*

The relationship continued for the next few years, apparently without incident. But on February 5, 2018, the stock market plunged, with the Dow industrials suffering the greatest single-day decline in history and the S&P 500 suffering its largest single-day percentage drop since August 2011. *See* Lewis Krauskopf, *Wall Street Plunges, S&P 500 Erases 2018's Gains*, Reuters, Feb. 5, 2018.

GPPB's account wasn't immune to the market shock. Indeed, the account held options in the crashing S&P 500. *See* Dckt. No. 59, Ex. D. The account became undermargined and suffered large losses. *See* Statement of Facts, at ¶¶ 6–7 (Dckt. No. 59); *see also* Dckt. No. 59, Ex. A, at ¶ 3.E.

Ironbeam took quick action to limit those losses, closing out all of GPPB's open positions. *See* Dckt. No. 59, Ex. A, at ¶ 3.E. When the dust settled on February 6, 2018, the old account balance of nearly $90,000 was wiped out. *See id.* at ¶¶ 3.E–F; *see also id.* Ex. D, at 27. The account instead had a deficit of $409,208.60. *See id.* Ex. A, at ¶ 3.F; Ex. D, at 27.

Ironbeam paid the account's deficit to the commodity futures exchange clearinghouse. *See* Statement of Facts, at ¶ 8 (Dckt. No. 59); *see also* Dckt. No. 59, Ex. A, at ¶ 3.G. Ironbeam then demanded reimbursement of the $409,208.60 deficit from GPPB (as the account holder) and Papadopoulos (as the guarantor), in addition to $44,450 in fees for liquidating the account's positions (Ironbeam's fee schedule specified a $50 charge for liquidating each position, and

7

Ironbeam liquidated 889 options in GPPB's account, for a total of $44,450). *See* Statement of Facts, at ¶¶ 7–10 (Dckt. No. 59); *see also* Dckt. No. 59, Ex. A, at ¶¶ 3.F–I. GPPB and Papadopoulos refused to pay. *See* Statement of Facts, at ¶ 15 (Dckt. No. 59); *see also* Dckt. No. 59, Ex. A, at ¶ 3.J.

Ironbeam then sued GPPB and Papadopoulos to recover the losses and liquidating fees. The complaint alleged two claims. Count I alleged a breach of the Customer Agreement, and Count II alleged a breach of the Personal Guarantee Agreement. *See* Dckt. No. 11. GPPB never appeared or defended the lawsuit, and the Court entered a default judgment against it in the amount of $470,423.94, including the entire account deficit and liquidation fees, plus interest and attorneys' fees and costs. *See* Dckt. Nos. 27, 29.

Papadopoulos appeared *pro se*, and Ironbeam ultimately filed a bare-bones motion for summary judgment, supported by a four-page brief. The motion and the supporting memorandum are not exactly in sync. The motion states that Ironbeam is moving on both the breach of contract and guarantee claims against Papadopoulos – the only claims remaining in the case after GPPB's default. *See* Dckt. No. 58 ("Plaintiff moves for summary judgment on its claims for breach of contract and guarantee."). Yet Ironbeam's supporting memorandum "leave[s] aside [whether] Papadopoulos is . . . directly liable" on the Customer Agreement with Ironbeam, instead asserting that "[t]he application and the account statement are in the name of GPPB, LLC and the parties intended for the account to be held in the name of the LLC." Dckt. No. 60, at 1 n.1. As a result, the Court treats the motion as one for partial summary judgment only as to Ironbeam's guarantee claim against Papadopoulos (that is, on Count II only).

## Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). The Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The Court should not "weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations omitted). The Court must "constru[e] the facts and mak[e] reasonable inferences in favor of the nonmovant." *H.P. by & Through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018) (citation and internal quotation marks omitted).

If the party moving for summary judgment shows that there is no disputed issue of material fact, the burden shifts to the nonmovant, who must show more than "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation and internal quotation marks omitted); *see Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*." *Scott*, 530 U.S. at 380 (emphasis in original, citation and internal quotation marks omitted).

Ironbeam's guarantee claim is based on state law and brought under the Court's diversity jurisdiction. *See* Dckt. No. 11, at ¶¶ 4–5, 22–26. Illinois federal courts sitting in diversity follow Illinois choice-of-law rules, which respect contractual choice-of-law provisions unless the parties' choice of law contradicts Illinois's fundamental public policy. *See Sound of Music Co. v. Minnesota Mining & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007). Both the Customer

Agreement and the Personal Guarantee Agreement specify that Illinois law applies. *See* Dckt. No. 59, Ex. B (Personal Guarantee Agreement), Ex. C at ¶ 30 (Customer Agreement). And applying Illinois law does not appear to contradict any Illinois public policy. *See Sound of Music Co.*, 477 F.3d at 915. So, Illinois law applies.

A guarantor "agrees to assume liability for the payment of another's debt or the performance of another's obligations under a contract." *City of Elgin v. Arch Ins. Co.*, 2015 IL App (2d) 150013, ¶ 19, 402 Ill. Dec. 900, 53 N.E.3d 31 (2015) (citations omitted). "A guaranty is . . . an obligation in the alternative to pay the debt [of the principal debtor] if the principal does not." *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 474, 345 Ill. Dec. 644, 939 N.E.2d 487 (2010).

A guarantor's obligations may be triggered by a breach of contract by the principal debtor. *See Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 668, 98 Ill. Dec. 470, 494 N.E.2d 592 (1986). A breach of contract claim requires four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014) (citation and internal quotation marks omitted). "As a general rule, the liability of a [guarantor] is measured by the liability of its principal" under the contract at issue. *Village of Rosemont*, 144 Ill. App. 3d at 668.

The undisputed evidence demonstrates that GPPB breached its agreement with Ironbeam.[2] First, GPPB has a valid and enforceable contract with Ironbeam. Papadopoulos

---

[2] Ironbeam's motion could be read to argue that the default judgment against GPPB precludes Papadopoulos from arguing that GPPB did not breach the contract, or from disputing the amount of damages caused by the breach. But under Illinois law, default judgments do not have preclusive effect because the issues are not actually litigated. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001) (holding that a federal court sitting in diversity applies federal common law regarding the preclusive effect of a previous federal diversity judgment, but the federal common law to be applied is the

signed the Customer Agreement on behalf of GPPB. *See* Dckt. No. 59, Ex. C, at 18 (Papadopoulos's signature on Customer Agreement); *id.* Ex. B (Papadopoulos's signature on Personal Guarantee as "General Manager" of GPPB); *see also* Dckt. No. 59, Ex. A at ¶ 3.D (declaration by Ironbeam Chief Compliance Officer). Papadopoulos offers no facts that call into question the existence of a valid contract.

Second, Ironbeam substantially performed under the agreement. The account was open for trading for two years. *See* Dckt. No. 59, Exs. B–D. Again, Papadopoulos does not offer any facts suggesting that Ironbeam did not substantially perform.

Third, GPPB breached the Customer Agreement, in at least two ways. GPPB breached the agreement by becoming undermargined. Ironbeam's Chief Compliance Officer Michael Higgins swore in an (admittedly terse) affidavit that the account "suffered a large loss," thus forcing Ironbeam to liquidate the account. *See* Dckt. No. 59, Ex. A, at ¶ 3.E. The account was more than $400,000 in the red after Ironbeam closed out all positions. *Id.* at ¶ 3.F. GPPB also committed a second breach by refusing to pay the account deficit, in direct violation of the promise to "indemnify Ironbeam . . . against any and all deficits, . . . losses, . . . costs and expenses." Dckt. No. 59, Ex. C, at ¶ 5; *see also id.* at ¶¶ 7–8. In his response, Papadopoulos does not dispute that the account was undermargined, or that GPPB refused to pay the deficit. *See* Dckt. No. 64.

Fourth, Ironbeam suffered damages as a result of the breach. After Ironbeam closed out the positions, the account had a deficit of more than $400,000, and GPPB owed liquidation fees

---

state law of the jurisdiction in which the deciding court sits); *In re Nikitas*, 326 B.R. 127, 133 (Bankr. N.D. Ill. 2005) ("Illinois adheres to the majority rule: default judgments have no collateral estoppel effect."); *accord* Restatement (Third) of Suretyship & Guaranty § 67(c) (1996).

totaling almost $50,000.  *See* Dckt. No. 59, Ex. A, at ¶¶ 3.E–F, H–I.  In the meantime, Ironbeam had to pay the balance to the clearinghouse.  *Id.* at ¶ 3.J.

GPPB thus breached the Customer Agreement.  Under the Personal Guarantee Agreement, Papadopoulos shares the same liability as GPPB.  Papadopoulos agreed to "personally guarantee[] the prompt, full and complete performance of any and all of the duties and obligations of [GPPB] and the payment of any and all damages, costs and expenses which may become recoverable by Ironbeam from [GPPB]."  Dckt. No. 59, Ex. B; *see also Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 668, 98 Ill. Dec. 470, 494 N.E.2d 592 (1986) ("the liability of a [guarantor] is measured by the liability of its principal").

Based on the undisputed material facts, Ironbeam is entitled to judgment as a matter of law on its claim that Papadopoulos breached the guarantee.  Ironbeam and Papadopoulos entered into a valid contract, the Personal Guarantee Agreement.  *See* Dckt. No. 59, Ex. B.  Ironbeam substantially performed by serving as the broker for GPPB in the years that followed.  *See* Dckt. No. 59, Ex. D.  Papadopoulos breached that agreement by failing to pay GPPB's debit balance. *See* Dckt. No. 59, Ex. A, at ¶ 3.J.  And Ironbeam suffered damages totaling $453,658.60, plus interest, costs, and attorneys' fees.  *Id.* at ¶ 3.I.  Papadopoulos does not dispute these facts.  *See* Dckt. No. 64.

Instead, Papadopoulos asserts that Ironbeam "brought [the] losses on to themselves" by "recklessly liquidat[ing] [GPPB's] account[] in the middle of the night and at a time that no liquid markets exist."  *Id.* at 1–3.  Papadopoulos asserts that he saw Ironbeam making these reckless trades "as I watched the screens in the middle of the night."  *Id.* at 2.

Papadopoulos does not offer any admissible evidence to support those assertions.  And he did not file a Rule 56.1 response, either.  Instead, Papadopoulos simply asserted facts in his brief,

12

without more, and thus they count for nothing. *See* Fed. R. Civ. P. 56(e); Local Rule 56.1(b)(1); *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.") (citation and internal quotation marks omitted); *Bolden v. Barnes*, 2013 WL 5737359, at *2 (7th Cir. 2013) ("Bolden's written response to the summary judgment motion asserts certain facts. Those facts are disregarded because facts may be considered on summary judgment only if they are presented in a compliant Local Rule 56.1 statement or response."); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.") (citation omitted); *Midwest Imps., Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of . . . presenting additional facts to the district court"); *see also Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

But even if Papadopoulos had put his story in an affidavit, the result would not change. He essentially argues that Ironbeam failed to mitigate GPPB's losses. Papadopoulos may want to second-guess Ironbeam's trading decisions, but from a contractual perspective, that ship has sailed.

The Customer Agreement gave Ironbeam unfettered discretion to "close out [GPPB's] open position(s) in whole or in part, in any manner Ironbeam deem[ed] fit," if GPPB failed to properly margin its account. Dckt. No. 59, Ex. C, at ¶ 7. If "Ironbeam, for any reason whatsoever, deem[ed] itself insecure or if necessary for Ironbeam's protection," then Ironbeam

13

was authorized, "in its sole discretion," to sell the positions and close the account. *Id.* at ¶ 8. Any such sale was "without any liability on the part of Ironbeam to Customer." *Id.*

When the S&P 500 plunged, the Customer Agreement gave Ironbeam authority to close out GPPB's positions at any time of Ironbeam's choosing. Papadopoulos complains that the trades took place shortly before midnight (EST), when the "only open active market in the world is Australia" and "Shanghai is on lunch break." Dckt. No. 64, at 3. But under the plain language of the agreement, the timing of the trades was Ironbeam's call to make. *See Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395–96 (7th Cir. 2003) (holding that the Court will enforce the parties' contractual terms to the letter).

Papadopoulos complains that the value of the positions might have rebounded in the weeks that followed, if Ironbeam had simply sat tight and waited. A few weeks later, the account "would have made an additional $25,000–35,000." Dckt. No. 64, at 3. But there was no way to know the future of the market. Ironbeam had no crystal ball foretelling future price changes. And in the meantime, Ironbeam did not have to suffer the risk of even greater losses. The agreement gave Ironbeam the express contractual right to protect itself from day one.

It is no surprise that the contract gave Ironbeam such broad discretion. Illinois case law gives brokers a wide berth to quickly close out commodity futures positions when financial markets fall. *See First Am. Discount Corp. v. Jacobs*, 324 Ill. App. 3d 997, 1012, 258 Ill. Dec. 291, 756 N.E.2d 273 (2001). And there is little reason to worry that the brokers are needlessly tossing traders overboard when seas get rough. Indeed, brokers and traders are both exposed to losses due to market dips, and both want to diminish the damage. Ironbeam's interests were aligned with GPPB and Papadopoulos – all of them wanted to minimize losses, and extract as much value from the positions as they could.

14

Remember, Ironbeam had to immediately pay all of GPPB's losses to the clearinghouse, and then seek reimbursement from GPPB or Papadopoulos. But collecting from Papadopoulos is a dubious proposition. As Papadopoulos admits, Ironbeam knew that he did not have any "other funds besides" what was deposited in the trading account, and so Papadopoulos was judgment proof. Dckt. No. 64, at 2, 4. Ironbeam had no reason to inflate GPPB's losses by waiting to trade at the worst possible moment.

Papadopoulos offers a Hollywood-ready explanation for Ironbeam's midnight trading, but it requires a departure from the workaday world of commodity exchanges. According to Papadopoulos, he is the victim of a conspiracy between Ironbeam, the FBI, and organized "Gangsters" to cause the losses in GPPB's trading account. *See* Dckt. No. 64, at 2.

"[F]or 24 years, [Papadopoulos] has been a victim of a corrupt cooperation between FBI agents and Gangsters, the Fanjul Organized Crime Family." *Id.* The midnight trading, according to him, was part of the conspiracy. Ironbeam "actually wanted to wait until there was no liquidity so they can easily cross trades with organized crime." *Id.* at 3. "The Ironbeam incident is just another FBI scam designed to convince the defendant to relocate to Greece and abandon all domestic litigation plans." *Id.* at 2.

That story, while striking, was nothing new. In fact, it was par for the course. Papadopoulos offered similar conspiracy theories in other submissions to this Court. *See, e.g.,* Dckt. No. 43, at 1 ("I have been a victim of a corrupt conspiracy between FBI agents and Gangsters for some 23 years."); Dckt. No. 62, at 2 (complaining about "FBI death threats"); Dckt. No. 77, at 2 (alleging that the Fanjul family has the "$17 billion missing from the Madoff Investors").

Papadopoulos does not elaborate on what his "domestic litigation plans" are, or why the FBI wants to snuff them out. *See* Dckt. No. 64, at 2. But he asserts that he has been a party to "about 80 cases" where "the adversary was the FBI, the Fanjuls or 3rd parties cooperating with them." *Id.* at 5. Papadopoulos further asserts that the FBI or the Fanjul family has subverted the federal judiciary to stack the deck against him by engineering transfers of his cases to judges friendly to the FBI, or by transferring cases to judges who are junior and/or overworked, or even by bribing judges. *Id.* at 3–5.

Those are serious allegations. But Papadopoulos submits no admissible evidence to support them, as required by Rule 56 and Local Rule 56.1. Without admissible evidence, his story is just a story. It has no evidentiary value, and cannot create a genuine issue of material fact. The Court gives no weight to his tale of conspiracy.

## Conclusion

Ironbeam's motion for summary judgment against Papadopoulos is granted with respect to Count II (the guarantee claim). To the extent that Ironbeam's motion seeks summary judgment against Papadopoulos on Count I (the breach of contract claim under the Customer Agreement), the motion is denied without prejudice.

Date: January 13, 2020

Steven C. Seeger
United States District Judge